(April 24, 2007)

■ 1050 TENANTS CORP., Respondent, v STEVEN R. LAPIDUS et al., Appellants. [835 NYS2d 68]—

Order and judgment (one paper), Supreme Court, New York County (Marylin G. Diamond, J.), entered June 19, 2006, which, inter alia, granted plaintiff's motion for summary judgment on its cause of action for ejectment, unanimously affirmed, with costs.

In 1983, defendants Steven and Iris Lapidus purchased the shares allocated to the proprietary lease for apartment 4B in plaintiff cooperative's building. Beginning in 1992, defendants, claiming unremedied conditions in their apartment, withheld payments for maintenance, electricity and special assessments, repeatedly and for extended periods of time. The cooperative brought multiple nonpayment proceedings, which, either by court order or settlement stipulation, resulted in the defendants' payment of over $170,000 in arrears and more than $400,000 in attorneys' fees.

Litigation History

In a 1992 nonpayment proceeding, the Housing Court (Marilyn Shafer, J.) awarded the cooperative $43,834.24 in arrears and denied the Lapiduses any abatement, after discrediting their testimony that "they would allow themselves to live in fear and with terrible conditions for years on end without taking any affirmative steps to correct the problems," and finding their other assertions either unsubstantiated or pertaining to purely cosmetic appearances in the common areas. The court found defendants' arguments particularly incredible in light of the fact that Mr. Lapidus is an experienced real estate and landlord-tenant lawyer. After a protracted hearing on attorneys' fees for that case, the Civil Court (Martin Shulman, J.) commented on defendants' "obduracy," "needless and groundless pre-trial motion practice," attempts to "delay or derail the underlying proceeding . . . , implicitly designed to economically force the Coop to its 'knees,' " and the cooperative's "total victory"; following an appeal, defendants stipulated to pay $328,655.84 in attorneys' fees, plus interest.

Before the issue of attorneys' fees in the first action was resolved, the cooperative commenced a second nonpayment proceeding, in 1995, as a result of which the Housing Court (Howard Malatzky, J.) directed defendants to pay $55,681.81 in arrears, offset by $3,340.91 as a rent abatement, thereby totaling $52,340.90. In addition, the court awarded the cooperative $115,000 in attorneys' fees and over $15,000 in prejudgment interest, later reduced by stipulation to $75,000 in fees and $6,000 in interest.

Another nonpayment proceeding, brought in 1999, was settled by stipulation, so ordered by the court (Bruce Kramer, J.), in which defendants paid $16,098.29 in arrears, and the cooperative credited their account $10,000 to replaster walls and ceilings, hang new wallpaper, and clean a carpet. Defendants further agreed that "under no circumstances" would they withhold payment of electric charges, and that they would not withhold

maintenance or additional assessments unless they first sent written notice to the cooperative's managing agent, superintendent and attorneys; allowed the cooperative 10 business days from the date of notice to cure; commenced a Housing Part proceeding if the cooperative failed to cure; and substantially prevailed in the Housing Part proceeding.

Notwithstanding that stipulation, defendants thereafter withheld payments for maintenance and additional assessments without complying with the agreed-upon procedures, and withheld payments for electricity. In a subsequent nonpayment proceeding, the Housing Court (Gerald Lebovits, J.) found incredible Mr. Lapidus's testimony that he never knew about the stipulation, "even though he was a partner of a law firm, he specialized in real estate law, an associate of his firm signed the stipulation, he received a $10,000 abatement, he was involved in a great deal of litigation with his cooperative, and he knew that his case ended the day his associate appeared in court." The court also rejected the Lapiduses' argument that their tendering maintenance for a single month constituted a defense to withholding payments for many months. The court issued a judgment in favor of the cooperative in the amount of $59,270.69, plus interest.

Not only did defendants disregard their obligations under the stipulation, but they also installed, without permission of the cooperative, a water-cooled air conditioning system, which caused substantial water damage to the apartment and personal property of the shareholder-tenant below. The Lapiduses ignored the protestations of their neighbor and denied the cooperative access to inspect the system, compelling the cooperative and the neighbor to bring separate actions, later consolidated, against them.

By stipulation dated September 30, 2002, so ordered by Supreme Court (Marylin G. Diamond, J.), defendants agreed to disconnect their water-cooled air conditioning units from the building's water supply and drain lines and to cap those lines. They further agreed to pay $7,345.94 in arrears of maintenance and electric charges through October 2002. The cooperative placed $15,000 in escrow to reimburse defendants for the costs of removing the system and replacing it with an air-cooled one.

Even though the cooperative deposited the funds in escrow to underwrite the replacement of the air conditioning system, the Lapiduses refused to honor their obligations under the stipulation, and on February 4, 2003, Justice Diamond found them in contempt for failure to abide by the terms of the stipulation and directed them to disconnect their water-cooled air conditioning

system. By order and judgment entered October 29, 2004, Justice Diamond adjudged them in contempt a second time, vacated the stipulation, directed that the funds in escrow be returned to the cooperative, permitted the cooperative to retain the Lapiduses' payment of arrears of $7,345.94, and issued a permanent injunction that the Lapiduses remove their water-cooled air conditioning system.

Thereafter, the cooperative's board of directors sent defendants written notice of a special meeting of the board to consider a resolution to terminate their proprietary lease, pursuant to section 34 (e) of the lease, "on the grounds that the tenancy of the [Lapiduses] is undesirable," due to their chronic withholding of maintenance and other payments, the nuisance of installing and refusing to dismantle a water-cooled air conditioning system that caused damage to their downstairs neighbor, and the protracted litigation in which defendants' arguments were repeatedly found to be meritless and in bad faith. At the special meeting, where counsel appeared on defendants' behalf, the board unanimously adopted the resolution.

Defendants threatened to sue any shareholder who voted to terminate their tenancy, and therefore the board enacted a resolution to indemnify and hold harmless the shareholders. At the special shareholders' meeting to consider the resolution to terminate defendants' proprietary lease, defendants' counsel warned the shareholders of "the serious legal consequences" and "substantial liability" that would befall them should they "choose to evict the Lapiduses." Nevertheless, 98% of the shares voted in favor of the resolution.

Defendants refused to vacate their apartment, and the cooperative commenced this action for, inter alia, ejectment and attorneys' fees. Justice Diamond, well acquainted with the history of the case, granted the cooperative summary judgment on the ejectment cause of action and referred the issue of attorneys' fees to a special referee.

Discussion

Decisions of residential cooperative corporations, including termination of a shareholder's tenancy for objectionable conduct, are assessed under the business judgment rule (*see 40 W. 67th St. v Pullman*, 100 NY2d 147, 153-154 [2003]). The courts will not substitute their judgment for that of a cooperative's board of directors and shareholders, as long as the corporate action is authorized, in furtherance of the cooperative's legitimate interests, and taken in good faith (*see id.* at 155; *Matter of Levandusky v One Fifth Ave. Apt. Corp.*, 75 NY2d 530, 537-538 [1990]).

The cooperative terminated defendants' tenancy pursuant to section 34 (e) of the propriety lease, which provides for termination: "If at any time the Lessor [the cooperative] shall determine, upon the affirmative vote of both four-fifths of the Board of Directors and the holders of record of two-thirds or more of the shares of the Lessor then issued and outstanding, at meetings of both such directors and such shareholders duly called to take action on the subject, that because of objectionable and undesirable conduct on the part of the Lessee [the Lapiduses], or of a person dwelling in or visiting the apartment, the tenancy of the Lessee is undesirable. (Repeatedly to violate or disregard the house rules hereto attached or hereafter established in accordance with the provisions of this lease, or to permit or tolerate a person of dissolute, loose or immoral character to enter or remain in the Building or the apartment, shall be deemed to be objectionable and undesirable conduct.)" Defendants contend that the parenthetical situations enumerated in the proprietary lease are the sole bases for establishing "objectionable and undesirable conduct," or at least that there is an ambiguity, which must be resolved against the cooperative as drafter, whether those are exclusive factors or merely examples. As Supreme Court aptly noted, there is nothing in the parenthetical statement to indicate it is other than illustrative, and an exhaustive list would not have been placed in an aside. In any event, House Rule Four states that "[n]o lessee . . . of an apartment shall . . . do or permit anything to be done therein which will interfere with the rights, comforts or conveniences of other occupants of the building." Defendants' repeated refusal to remove an air conditioning system that leaked into the apartment below and caused damage interfered with the "rights, comforts or conveniences" of their neighbors, and thus constituted a violation or disregard of the house rules for purposes of section 34 (e) of the proprietary lease. The unjustified withholding of maintenance and other payments for extensive periods of time, as found by several courts, which compelled the cooperative to bring multiple costly nonpayment proceedings, falls within any definition of "objectionable and undesirable conduct," and, since the financial burdens were borne by the shareholder-tenants, also interfered with their "rights, comforts or conveniences." As such, the votes in favor of the resolution were authorized. Relatedly, evicting tenants who consciously and unabashedly damage another neighbor's property and inflict thousands of dollars in unnecessary legal fees is in furtherance of the cooperative's legitimate interests (*see Pullman*, 100 NY2d at 156-157).

According to defendants, the term "objectionable and unde-

sirable conduct" is so vague that it is unenforceable. The provision is fairly concrete, defendants were given detailed written notice of what actions were deemed objectionable and undesirable, and the cooperative's interpretation was reasonable. Defendants' attempt to involve the court in "judicial second-guessing" is precisely why the business judgment rule applies to cooperative determinations (*see Levandusky*, 75 NY2d at 539-540).

The proprietary lease does not violate public policy by restricting access to the courts. There is no public policy favoring the repeated assertion of unsustainable arguments, a pattern of delaying tactics designed to inflict extensive costs on the adversary, dishonesty or disingenuousness with the court, disregard of so-ordered stipulations, or contempt of court orders.

With respect to defendants' argument that the board purchased the shareholders' votes, in violation of Business Corporation Law § 609 (e),* by promising to indemnify them against any potential lawsuits by defendants, the promise was not conditioned on any particular vote by the shareholders and was merely responsive to defendants' threats to personally pursue anyone who opposed them. We note that, in a letter to the shareholders, defendants previously took the position that the board's promise to indemnify was worthless: "Where does the Board think the money for any such indemnification would come from? The answer is simple, it comes out of your pocket. Therefore, the Board is doing . . . nothing in promising to 'indemnify' you with your own money." Moreover, under defendants' own interpretation, their threats against shareholders who might vote in favor of the resolution offered something of value to those who voted against it, i.e., freedom from "serious legal consequences" and "substantial liability," and thus ran afoul of Business Corporation Law § 609 (e).

With a doctrinaire blunderbuss, defendants contend that res judicata, collateral estoppel, and judicial estoppel preclude the cooperative from commencing this ejectment action based on termination of the proprietary lease, because at the time of filing there was a pending nonpayment proceeding for maintenance and other charges due under the lease. There is nothing inconsistent in the cooperative's actions, and defendants cite no authority requiring a lessor to abandon its earlier-asserted claims for unpaid rent after the lease is terminated. While invoking the preclusion doctrines against the cooperative, defendants

---

* Business Corporation Law § 609 (e) provides: "A shareholder shall not sell his vote or issue a proxy to vote to any person for any sum of money or anything of value, except as authorized in this section and section 620."

display no inhibition to arguing certain "affirmative defenses," including that their own apartment was uninhabitable or insufficiently repaired, which they concede were previously raised and rejected in the nonpayment proceeding.

Assuming, arguendo, that the board has permitted other shareholder-tenants to install or retain water-cooled air conditioning systems, there is not even a suggestion that any such units caused damage to an apartment, and thus the cooperative's decision to terminate defendants' tenancy was not discriminatory.

The board did not retaliate against defendants because they "sought redress for Landlord's own breach of its contractual and statutory responsibilities through the courts," as defendants would have it; the board did not breach any duties, unlike defendants, who chronically failed to meet their financial obligations and obstinately refused to abate a nuisance.

Defendants' inability to corroborate their conclusory charge of bad faith on the part of the board and/or the shareholders does not warrant a denial of summary judgment to permit needless discovery. The current record, most of which was generated in the courts over the past 15 years, demonstrates the cooperative's lack of malice. Deferring to the cooperative's decision would not give boards "almost unfettered license" to evict owners from their homes, as defendants assert; to the contrary, prohibiting the cooperative from ejecting defendants would allow shareholder-tenants to flout their most basic obligations, i.e., to pay maintenance and refrain from causing physical damage to the building.

By the terms of the resolution, defendants' lease terminated on June 15, 2005. The cooperative commenced this ejectment action on or about June 21, 2005, and therefore the action is timely. Defendants argue that the time within which the cooperative had to bring an action started to run in 1992, when defendants first breached the proprietary lease by unjustifiably withholding maintenance payments. While the cooperative might have spared itself much grief and expense had it sought to remove defendants at that time, it should not be penalized for its forbearance or good faith attempts to settle the matter. Concur—Andrias, J.P., Saxe, Buckley, Gonzalez and McGuire, JJ.